**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

KEVIN FIEDOR,

    Plaintiff,

v.                                Case No.: 4:18-cv-00191-RH-CAS

FLORIDA DEPARTMENT OF
FINANCIAL SERVICES, et al.,

    Defendants.

_____/

**PLAINTIFF KEVIN FIEDOR'S**
**POST-TRIAL MEMORANDUM AND REPLY**

    Plaintiff Kevin J. Fiedor provides this memorandum at the Court's request to inform on three primary issues:

1. The impact of the *Monell* doctrine on this case. The *Monell* doctrine's "policy or custom" requirement does not apply to Defendant and would not change the result here even if it did because the evidence establishes that an unconstitutional policy or custom existed.

2. The impact of the "voluntary cessation" doctrine vis-à-vis mootness. This case is far from moot because the risk of continued constitutional violations is great, necessitating Court intervention by means of a permanent injunction.

1

3. The impact of Defendant's actions on Mr. Fiedor's constitutional rights. The *Pickering* test establishes that Defendant, even acting as an employer rather than a sovereign, committed multiple constitutional violations.

**I.   Whether *Monell* applies to state actors has not been decided in this Circuit, but it need not be decided here because either way, the outcome is the same given Defendant's unconstitutional policy or custom.**

    A.   <u>No binding precedent extends *Monell* to state actors</u>.

In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), the United States Supreme Court held that a municipality may be liable under 42 U.S.C. § 1983 for the acts of its agents only if those acts are pursuant to a municipal policy or custom. The Court did not make the same holding as to state actors. Defendant cites three cases to persuade this Court to extend *Monell's* "policy or custom" requirement to states. Not only are those cases not binding on this Court, not a single one of them considered or analyzed the question. Two of them never even mention *Monell*. See *Hall v. Jarvis*, 3:10-cv-442-J-99MMH-TEM, 2011 U.S. Dist. LEXIS 20658 (M.D. Fla. Mar. 1, 2011) and *H.G. v. Carroll*, 4:18cv100-RH/CAS, 2018 WL 8799301 (N.D. Fla. Apr. 17, 2018). Thus, these cases should not be relied upon as a basis for extending *Monell* beyond its municipal borders.

Regardless, the Court should save this determination for another day because the analysis does not affect the outcome here. Because the evidence establishes that an unconstitutional policy or custom did exist, the state is liable either way.

B. <u>The evidence establishes an unconstitutional policy or custom.</u>

Viewed in its totality, the evidence establishes an unconstitutional policy intent on restricting religious speech in the workplace. The absence of a written policy is irrelevant. As this Court has recognized, "the Eleventh Circuit has said that as few as several incidents can establish precisely the type of informal policy or custom that is actionable under section 1983." *Carroll*, 2018 WL 8799301, at *3 (internal quotations and citations omitted). The actions by those with decision-making authority, coupled with the understanding and implementation by those tasked with enforcing those decisions, speak loudly of such a policy. Even if those enforcing the decisions, such as Lt. David O'Dell, somehow misunderstand them, knowledge of the censorship on religious speech went well beyond Lt. O'Dell.

Lt. O'Dell testified that upper management instructed him on a phone call to monitor the bulletin board for religious content [Trial Transcript 23:10-14 ("Trial Tr.")]. Shortly after receiving that instruction, Lt. O'Dell relayed it to Mr. Fiedor:

> Q: And shortly after you received this phone call from management, did you have a discussion with Mr. Fiedor regarding the directions you had been given?
> A: I did have a conversation with him, yes, sir.
>
> Q: And based on your directions from management, did you give Mr. Fiedor any instructions about discussing religion in the DFS workplace?
> A: Yes, sir.
>
> Q: And what would those instructions have been?

> A: Well, just that we couldn't talk about anything offensive or inappropriate in the office, and that we couldn't post anything on the bulletin board that was religious or political.
>
> Q: So would discussions about church be banned at this point?
> A: In my opinion, yes.
>
> \*\*\*
>
> Q: And I believe you already stated, but invitations to church events were also prohibited at this point?
> A: That was my understanding, yes.

[Trial Tr. 25:9-24]. Not only did Lt. O'Dell repeat these instructions to Mr. Fiedor shortly after the call from management, but he also gave these same instructions to several others in his office around the same time. [*Id.* at 110:4-23].

While Defendant tries to discredit Lt. O'Dell for his inability to recall who specifically gave him this instruction, who gave it to him is irrelevant in light of the subsequent endorsement of the policy by Lt. O'Dell's superiors. After being instructed about his new role as religious speech police, O'Dell acted in that capacity by reporting violations of the no-religion policy to his superior, Captain Chris Welch. [*Id.* at 34:1-3; 37:6-17; 50:10-11]. When Lt. O'Dell reported to Capt. Welch that a flier advertising Law Enforcement Appreciation Sunday was placed on a bulletin board, Capt. Welch responded by saying "something along the lines of, 'are you serious, it was on the board? Who put it on there?'" [*Id.* at 120:1-2]. Lt. O'Dell and Mr. Fiedor both testified that Capt. Welch stated he would relay the report from Lt. O'Dell further up the chain of command, which he in fact did. [*Id.* at 37:13-14;

4

120:3-5; Pl.'s Trial Ex. 8]. When Lt. O'Dell specifically asked Capt. Welch if he should return the flier to the board, Welch told him: "No, don't do that, just, just don't do anything . . . just let it be." [Trial Tr. 50:13-18]. At no time after these reports did Capt. Welch ever inform Lt. O'Dell that the fliers could remain, that Lt. O'Dell acted inappropriately, or that he did not need to report these incidents. [*Id.* at 37:6-17; 51:6-11]. Thus, Lt. O'Dell continued to purge religious viewpoints and content from the workplace with Capt. Welch's knowledge and approval.[1]

These instances of religious censorship by Capt. Welch and Lt. O'Dell alone establish the informal policy that is actionable under 1983. *Carroll*, 2018 WL 8799301, at *3 (internal quotations omitted). But there is more. Director Simon Blank admitted at trial that over eighteen months earlier he had read Lt. O'Dell's affidavit[2] wherein O'Dell stated, under penalty of perjury, that management told him to monitor the bulletin boards for religious postings. [Trial Tr. 143:20-144:21; Pl.'s Trial Ex. 7 ("O'Dell Aff.") ¶3]. That knowledge alone—that a Lieutenant in his chain of command thought he was required to banish religious postings—should have caused Dir. Blank to take immediate action to correct any alleged misperception if there was one. Moreover, another church flier was removed from a

---

[1] These instances validate Lt. O'Dell's understanding that he was expected to monitor religious conversation and postings in the office. If Lt. O'Dell was somehow mistaken in his understanding, it was a mistake that no one in his chain of command ever corrected, despite numerous opportunities to do so.

[2] This affidavit was submitted as part of the EEOC/Office of Human Rights investigation, which took place prior to the filing of this litigation.

5

bulletin board in the Tallahassee office—another office within Dir. Blank's jurisdiction—and Dir. Blank did nothing to investigate that incident either. [Trial Tr. 179:14-16]. Thus, the religious hostility in play in the Pensacola office was not an isolated incident. Dir. Blank's failure to act establishes that he either endorsed this censorship (at worst), or else disregarded this practice and allowed it to continue (at best). Dir. Blank's complete inaction that allowed the censorship to continue speaks far louder than his belated claim that there was no policy or custom of religious suppression. [*Id.*] Dir. Blank permitted this censorship to continue on his watch, unabated and in multiple locations, for an extended period of time. That is "precisely the type of informal policy or custom that is actionable under section 1983." *Carroll*, 2018 WL 8799301, at *3.

**II.   Given that the religious censorship could readily recur, this matter is not moot and requires the Court's intervention to prevent Defendant's further abridgment of religious speech in the workplace.**

   A.   <u>For voluntary cessation of an offending practice to render a case moot, it must be absolutely clear that the practice is unlikely to recur.</u>

Defendant contends that an injunction is unnecessary, and the case therefore moot, because Defendant voluntarily ceased its unconstitutional censorship. An issue is not necessarily moot, however, when the offending behavior terminates as a result of a defendant's *voluntary* cessation. The Eleventh Circuit and the Supreme Court have explained that a voluntary cessation would "leave 'the defendant . . . free to return to his old ways.'" *Troiano v. Supervisor of Elections*, 382 F.3d 1276, 1282

6

(11th Cir. 2004) (quoting *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968) (other citations and quotation omitted). If a voluntary cessation of offending behavior could moot a case, "a party could 'moot a challenge to a practice simply by changing the practice during the course of a lawsuit, and then reinstate the practice as soon as the litigation was brought to a close.'" *Christian Coal. v. Cole*, 355 F.3d 1288, 1291 (11th Cir. 2004) (quoting *Jews for Jesus, Inc. v. Hillsborough Cnty. Aviation Auth.,* 162 F.3d 627, 629 (11th Cir. 1998)).

A voluntary cessation of improper conduct will not moot a case unless there is no reasonable expectation that the conduct might recur after the case terminates. *Troiano*, 382 F.3d at 1283 (citing *U.S. v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)). While in some cases, government actors are entitled to a rebuttable presumption that the conduct will not recur, *Troiano*, 382 F.3d at 1283; *see also Brenner v. Scott*, No. 4:14cv107-RH/CAS, 2016 U.S. Dist. LEXIS 91969, at *6-7 (N.D. Fla. Mar. 30, 2016), that presumption only applies when the government policy "has been unambiguously terminated." *Troiano*, 382 F.3d at 1285. Put another way, the government is entitled to this presumption only if "subsequent events [have] made it *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth Inc., v. Laidlaw Envtl. Services (TOC) Inc.*, 528 U.S. 167, 189 (2000) (emphasis added) (internal quotation omitted). Defendant is not entitled to that presumption.

B. <u>Defendant failed to meet the formidable burden of proving religious suppression will not recur once this litigation ends.</u>

The first question this Court must determine is whether "it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Brenner,* 2016 U.S. Dist. LEXIS 91969, at *6. Here, Defendant bears a "formidable" and "heavy burden" of persuasion. *Friends of the Earth,* 528 U.S. at 189 and 190 (internal citations and quotation omitted). As Defendant recognizes, the factors set forth in *Rich v. Sec'y, Florida Dep't. of Corr.,* 716 F.3d 525, 531-532 (11th Cir. 2013), are most relevant in determining whether it is *absolutely clear* that the offending conduct will not continue:

- Whether the termination of the offending conduct is unambiguous;
- Whether the change in government policy or conduct resulted from substantial deliberation or was merely an attempt to manipulate jurisdiction;
- Whether the government has consistently applied the new policy or adhered to a new course of conduct.

These factors do not weigh in Defendant's favor.

1. *Unambiguous termination of religious censorship.*

In analyzing the first factor of whether a practice has been unambiguously terminated, the Court may consider two sub-factors: the timing of the cessation and the content of the cessation. *Rich*, 716 F.3d at 531-532. A practice that is terminated "in a clandestine or irregular manner . . . can hardly be said . . . [to be] unambiguous."

8

*Harrell v. Fla. Bar*, 608 F.3d 1241, 1267 (11th Cir. 2010). "Clandestine" and "irregular" are accurate descriptors of the timing and content of the cessation here.

### *a. The timing of the cessation is suspect at best.*

Defendant points to the "informational bulletin" to establish that it unambiguously terminated its religious censorship. That bulletin was distributed by Dir. Blank on July 29, 2019, four days after this Court announced that Defendant's motion for summary judgment was partially denied, and less than two months before trial. The elephant-in-the-room question is, why was this bulletin not issued long before?

At least as early as September 2017, when Mr. Fiedor filed the underlying discrimination complaint, Dir. Blank was alerted to religious discrimination in the Pensacola office. Soon thereafter, in January 2018, Dir. Blank received Lt. O'Dell's affidavit in which O'Dell stated that he was "advised from management to monitor the bulletin board in the office to make sure that nothing religious . . . was posted there." [O'Dell Aff. at ¶3] That affidavit also alerted Dir. Blank to the fact that Lt. O'Dell had acted on this instruction by notifying his supervisor, Capt. Welch, about a prohibited church flier in the Tallahassee office that was later removed by management. *Id.*

In light of Dir. Blank's receipt of both of these documents describing religious censorship in the workplace, the time to distribute an informational bulletin

explaining and/or clarifying Defendant's policy was in late 2017 or early 2018—before litigation. *See Harrell*, 608 F.3d at 1266 ("a defendant's cessation before receiving notice of a legal challenge weighs in favor of mootness"). Yet Dir. Blank did not correct the discrimination in September 2017; he did not correct it in January 2018 [Trial Tr. 144:19-24]; and he still did not correct it in February 2019, more than a year later, when Lt. O'Dell again testified to it at his deposition.[3] [Transcript of Feb. 8, 2019 Deposition of David O'Dell Dep. ("O'Dell Dep.") at 13:4-11]. In fact, after Dir. Blank learned that Lt. O'Dell had removed a religious flier, he waited at least ten more days before finally issuing the informational bulletin. The latest Dir. Blank would have learned of this incident was July 19, 2019, when Mr. Fiedor filed his summary judgment affidavit describing it. [ECF #104-1, Plaintiff's Summary Judgment Affidavit at ¶¶17-18]. But the informational bulletin was not issued until July 29, 2019—after this Court denied summary judgment. [Trial Tr. 145:14].

The timeline does not lie: Dir. Blank was aware for nearly two years that religious censorship was occurring in his offices, yet he did nothing to stop it until it was clear this case was going to trial. Only with trial looming did he make his pretextual effort to stop it. [Trial Tr. 145:13-18].

---

[3] At his deposition, which Dir. Blank attended by phone [O'Dell Dep. at 3:5], Lt. O'Dell read and reaffirmed his previous affidavit in which he stated that he had reported a religious flier to Capt. Welch—a flier that O'Dell stated was later removed. [O'Dell Dep. at 13:4-17].

10

In *Rich*, the court found that a claim was not mooted by voluntary cessation because "the policy change was not made before litigation was threatened, but was instead 'late in the game.'" *Rich,* 716 F.3d at 532 (quoting *Harrell*, 608 F.3d at 1266). "[C]essation that occurs late in the game will make a court more skeptical of voluntary changes that have been made." *Harrell,* 608 F.3d at 1266 (internal quotation omitted). With almost two years of notice that a Lieutenant within his chain of command with supervisory and enforcement powers was curtailing religious speech, Dir. Blank did exactly nothing until very, very "late in the game." As in *Rich*, the "timing of [Defendant's] policy change creates ambiguity," *Rich,* 716 F.3d at 532, and if there is ambiguity in the termination of the offensive conduct, the issue is not moot. *Id*.

### b. *The content of the cessation is ambiguous.*

The second factor in deciding whether the challenged conduct has been unambiguously terminated is the content of the cessation. *Id.* at 531-532. "With respect to content, [courts] look for a well-reasoned justification for the cessation as evidence that the ceasing party intends to hold steady in its revised (and presumably unobjectionable) course." *Harrell*, 608 F. 3d. at 1266.

The informational bulletin issued by Dir. Blank purportedly terminating the religious censorship was not signed by anyone in management, and employees had no idea who issued it or for what reason. In fact, the Department did not even

11

consider this bulletin to constitute policy because to be policy, as Dir. Blank himself admitted, it needed to be signed. [Trial Tr. 176:24-177:7]. It was also undated. [*Id.* at 177:8-12]. Employees were not trained on its meaning, and there was zero follow-up on the part of Dir. Blank to ensure its implementation. [*Id.* at 175:20-24]. If Lt. O'Dell had somehow misunderstood the policy in the first place—and the evidence shows he did not—Dir. Blank should have explained the bulletin to ensure that Lt. O'Dell (and everyone else) knew what behavior needed to change in response to it. [*Id.* at 175:20-24]. Yet, as late as trial Dir. Blank affirmed that he still had had "no conversations with Lieutenant O'Dell on this issue." [*Id.* at 145:23-146:2].

Not only did Dir. Blank fail to explain the informational bulletin, but Lt. O'Dell did as well. Lt. O'Dell was tasked with enforcing policy in the Pensacola office, but he did nothing but post the bulletin on the bulletin board. [*Id.* at 45:4-7]. While Defendant contends that posting the bulletin showed Lt. O'Dell's intent to adhere to it [ECF #110, Def. Simon Blank's Post-Tr. Memo. ("Def. Post-Tr. Memo.") at 23], that logical leap is both unfounded and contradicted by the evidence. Even after Lt. O'Dell posted the bulletin, he told Mr. Fiedor that he was "not changing anything, because I haven't received any instructions." [Trial Tr. 129:2-4].

The content and circumstances surrounding the "cessation" show no indicia of any real, honest effort to unambiguously change the policy of religious discrimination. No "well-reasoned justification" was offered or supported to

establish that Defendant "intends to hold steady in its revised . . . course." *Harrell*, 608 F.3d at 1266. Because Defendant has not proven that the cessation is unambiguous, the suspiciously timed "cessation" does not moot this case.

### c. *Defendant's own Post-Trial Memorandum precludes any conclusion that the "cessation" will not recur.*

In its post-trial memorandum, Defendant stated that because Mr. Fiedor's office was "quite small," "limiting religious expression, to the extent it occurred, would be permissible." [Def. Post-Tr. Memo. at 15-16]. Defendant admittedly believes that—absent an injunction from this Court—it would be justified in resuming its prohibition of religious expression at any time and anywhere an office is "quite small." For this additional reason, it is not absolutely clear that Defendant has unambiguously terminated its offending conduct, and its voluntary-yet-reversible cessation cannot moot this case.

### 2. *Evidence that change resulted from substantial deliberation rather than an attempt to manipulate jurisdiction.*

As to the second factor of the *Rich* test, despite the "heavy" and "formidable" burden that Defendant bears to prove mootness, Defendant presented no relevant evidence that DFS, Dir. Blank, or anyone else engaged in any sort of deliberation, let alone *substantial* deliberation, prior to distributing the bulletin. Defendant could have collaborated with others in the division, such as the human resources department or those with an alleged "misunderstanding" of the no-religion policy,

13

to discuss Equal Employment Opportunity Commission guidelines, free speech guidelines, or how the bulletin should be handled or understood, but the record lacks evidence of any such deliberation. What *is* known is that the informational bulletin was issued very "late in the game"—after this Court's summary judgment ruling, when it was obvious this case was going to proceed—with no date, no name, no explanation, and no instructions. Lt. O'Dell—the one primarily responsible for enforcing this bulletin in the Pensacola office—was not given any information from management, superiors, human resources, employee relations, or anyone else as to how to enforce this ambiguous, non-policy bulletin. [Trial Tr. 47:10-14; 145:13-146:2]. Defendant has, therefore, failed to present any evidence that the second factor of the *Rich* test should somehow weigh in its favor.

> 3. *Evidence that the government has consistently applied the new policy or adhered to a new course of conduct.*

Defendant similarly fails on the third factor of the *Rich* test requiring a showing that it consistently applied and adhered to the new "policy." Defendant presented no evidence whatsoever that employees or management either understood this purported change, applied it, or adhered to any new course of conduct in light of it. In fact, Defendant relies solely on Lt. O'Dell's testimony that he believed the bulletin "changed what created the prohibition before" as its evidence that the government has consistently applied the new "policy." [Def. Post-Tr. Memo. at 11].

But even if Lt. O'Dell somehow understood this new "informational bulletin," his understanding did nothing to change his practice. As Mr. Fiedor testified:

> Q: And has anything changed in the DFS workplace since this document was issued?
> A: No.
>
> Q. Are you permitted to discuss religion in the DFS workplace since this document was issued?
> A. I am not.
>
> Q. Are you permitted to post flyers for your church in the DFS workplace since this document was issued?
> A. I am not.
>
> Q. Are you permitted to invite people to church in the DFS workplace since this document was issued?
> A. No.
>
> Q. Would you be permitted to post a flyer for the Sportsman's Night Out on the bulletin board since this document was issued?
> A. I don't believe I would.
>
> Q. Has anything from your perspective about DFS's conduct change [sic] since this document was issued?
> A. No, and I will preface it with this: I asked Lieutenant O'Dell, "I received this document, are there any instructions that go with this?" And he said, "No." He said, "I didn't receive a telephone call before it came out, I have no instructions afterwards." And I said, "Well, then it's business as usual?" He said, "I'm not changing anything, because I haven't received any instructions." So from my perspective, I was still under the directive that he gave me in 2017.
>
> Q. And has Simon Blank had any direct contact with you on this issue?
> A. No.

[Trial Tr. 128:4-129:9].

15

As this testimony demonstrates, the informational bulletin had zero practical effect on the religious censorship occurring within DFS. Because the bulletin was admittedly not a "policy" [*Id*. at 177:7], and because it included no explanation or context as to what, if anything, was supposed to change, Lt. O'Dell expressly intended to continue restricting religious speech. Thus, the reality is that this bulletin had (and has) no transformative impact whatsoever—and certainly does not satisfy the requisite "consistent application" or "new course of conduct" necessary for mootness. As such, Defendant also fails to meet the third part of the *Rich* test.

Having failed to satisfy any element of the *Rich* test, Defendant's "voluntary cessation" is nothing more than pretextual show for this Court. There is no reason to believe that, once this case is resolved, Defendant will not return to business as usual; therefore, Defendant's "voluntary cessation" cannot moot this case.

### III. *Walden* and *Pickering* do not require a different conclusion.

*Walden v. Centers for Disease Control & Prevention*, 669 F.3d 1277, 1285 (11th Cir. 2012), stands for the proposition that the government, acting as an employer, has more leeway to regulate speech than when acting as a sovereign. [Def. Post-Trial Memo. at 13-14]. When there are conflicting accounts of an employee's speech or conduct, a court should view the behavior as the government believed it to be "so long as that belief was reasonable." *Walden*, 669 F.3d at 1288. Here, Defendant's claimed belief about Mr. Feidor's conduct was not reasonable.

16

Following an investigation conducted by the Office of Inspector General ("OIG"), the OIG sustained an allegation against Mr. Fiedor and referred him for discipline based on its conclusion that he hung fliers, invited people to church, and acted disappointed and/or treated people differently if they did not accept his invitation. [Pl.'s Trial Ex. 12 at 28]. But the OIG drew these conclusions by ignoring the testimony of six witnesses who had no problem with Mr. Fiedor's conduct [*Id*. at 25-27] and by accepting the testimony of three others: one of whom Dir. Blank admitted was dishonest [Trial Tr. 116:21-23; 188:24-189:6]; one of whom stated that Mr. Fiedor did *not* overtly treat people differently based on whether they attended church events [Pl.'s Trial Ex. 12 at 25]; and the last of whom expressed her personal assumption that Mr. Fiedor's behavior was inappropriate simply because she had never seen anyone speak freely about religion in the workplace before. [*Id*. at 25–26].

Since the basis for Defendant's restrictions on Mr. Fiedor's speech arose from one witness's false allegations, another's non-existent allegations, and a third's general and unfounded assumptions, Defendant's belief with respect to Mr. Fiedor's religious speech was far from "reasonable," as required by *Walden*.[4]

---

[4] The OIG concluded that posting church fliers on the bulletin board was actionable conduct that justified referring Mr. Fiedor to Dir. Blank for discipline. [Pl.'s Trial Ex. 12 at 28; Trial Tr. 169:12-18]. Lt. O'Dell reviewed the OIG report. [Trial Tr. 45:20-46:12]. This further establishes that Lt. O'Dell was not mistaken in his belief that Defendant was attempting to prohibit religious speech in the workplace, particularly religious postings. OIG transmitted its unconstitutional message on behalf of Defendant, and Lt. O'Dell received it loud and clear.

The test set forth in *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968), balances an employee's First Amendment rights against the interests of a government employer to efficiently provide public services. Defendant did not present any evidence at trial that its ability to efficiently provide public services was in any way affected by religious speech in the workplace, and therefore has presented no evidence that it has any interest in prohibiting or discouraging religious expression in the workplace. As such, Defendant has no interest to balance against Mr. Fiedor's First Amendment rights. Thus, under *Pickering*, Mr. Fiedor's First Amendment rights infinitely outweigh Defendant's non-existent interest and there was, and is, no justification for Defendant to limit religious speech or postings in the workplace. An injunction should therefore issue prohibiting Defendant from interfering with its employees' rights to verbal religious expression and postings in the workplace.

## IV.  This case is not moot and this Court should issue an injunction.

The evidence in this case exposes Defendant's ongoing policy, custom, and practice of religious censorship—a policy unchanged by the informational bulletin. If Dir. Blank did not intend to restrict religious speech in the workplace, he would have corrected Lt. O'Dell's "misunderstanding" back in late 2017 or early 2018 when he undisputedly learned about it. But he did not. Instead, he waited nearly two

18

years—until four days after this Court denied summary judgment—to take any action at all, and even that action was ambiguous and ineffective.

All these facts establish that nothing has changed and to the extent Defendant claims it has, absent an injunction, any purported change can be immediately reversed once this case is over. Because Defendant has not established that it is *absolutely clear* that its policy of religious censorship is not likely to resume, Defendant has failed to meet its heavy and formidable burden to establish mootness. For these reasons, Mr. Fiedor respectfully requests that this Court issue a permanent injunction and award him attorneys' fees.

Respectfully submitted this 25th day of October 2019.

/s/ David C. Gibbs III
David C. Gibbs III, Esq.
Fla. Bar No. 0992062

P. Scott Miller, Esq.
Fla. Bar No. 0093792

The National Center for
Life and Liberty, Inc.
2648 FM 407, Suite 240
Bartonville, TX 76226
Telephone: (727) 362-3700
Facsimile: (727) 398-3907
Email: dgibbs@gibbsfirm.com
**ATTORNEYS FOR PLAINTIFF**

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing has been served upon counsel for the Florida Department of Financial Services on October 25, 2019 through the Court's CM/ECF filing system.

Robert J. Sniffen
rsniffen@sniffenlaw.com
Elmer C. Ignacio
eignacio@sniffenlaw.com
123 North Monroe Street
Tallahassee, Florida 32301.

/s/ David C. Gibbs III
David C. Gibbs III, Esq.