# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION

KEVIN FIEDOR,

      Plaintiff,

v.                              CASE NO. 4:18cv191-RH-CAS

FLORIDA DEPARTMENT OF
FINANCIAL SERVICES et al.,

      Defendants.

_____/

## OPINION ON THE MERITS

This case arises from a state agency's regional manager's mistaken view that agency policy prohibited employees from discussing religion at work or posting church-related materials on an office bulletin board. After the mistake came to light as a result of this lawsuit, the agency issued an unequivocal correction. Employees of the regional office now may discuss religion and post church-related materials on the bulletin board. Following a bench trial, this opinion holds moot the plaintiff employee's challenge to the manager's now-abandoned position. The opinion sets out the court's findings of fact and conclusions of law.

## I. Facts

The Florida Department of Financial Services has a Division of Investigative and Forensic Services. The Division has a Bureau of Fire and Arson Investigations. The Bureau has regional offices. In 2016, the plaintiff Kevin Fiedor managed the Bureau's northwest regional office in Pensacola. The Division director was Simon Blank, whose office was in Tallahassee. The Division had an Inspector General.

An employee in the northwest region complained that Mr. Fiedor had repeatedly pressured him to attend church events. Mr. Fiedor is an active member of a Baptist church. The employee said he suffered adverse treatment when he did not yield to Mr. Fiedor's pressure. The employee also complained about other matters.

Mr. Blank asked the Inspector General to investigate. The Inspector General concluded that Mr. Fiedor had pressured multiple employees to attend church events. The Inspector General also found, based on statements of multiple witnesses, that one of Mr. Fiedor's employees, Tony Grice, used vile epithets in the office to refer to African Americans and gays. The Inspector General found that another of Mr. Fiedor's employees, David O'Dell, made disapproving remarks about gays and was disrespectful to fellow employees.

In April 2017, Mr. Blank demoted Mr. Fiedor. Mr. Blank accepted the Inspector General's finding that Mr. Fiedor pressured employees to attend church

events but demoted him primarily for other reasons. Mr. Blank would have made the same decision anyway, that is, would have demoted Mr. Fiedor anyway, even had Mr. Fiedor not pressured employees to attend church events and even had there been no discussion of religion in the office at all.

Mr. Blank's principal concern was Mr. Fiedor's failure to deal with unrelated management and personnel issues—issues that were substantial and had persisted for months. These included the vile remarks, a subordinate's creation of a hostile environment in an outlying office, and a report that an employee committed acts of domestic violence and showed suicidal ideation. The employee was a law enforcement officer for whom domestic violence or suicidal ideation were of special concern.

In addition to demoting Mr. Fiedor, Mr. Blank suspended Mr. Grice and required Mr. O'Dell and Mr. Grice to attend diversity training.

Mr. Blank did not take these actions against Mr. Fiedor, Mr. O'Dell, or Mr. Grice based on their religious beliefs or practices.

After the demotion, Mr. Fiedor continued to work in the northwest regional office. The new manager of the office was Mr. O'Dell. Mr. Blank told Mr. O'Dell it was his responsibility to prohibit offensive or disparaging remarks in the office. This was hardly surprising and certainly not inappropriate. Mr. O'Dell had, after all, himself been disrespectful to other employees, and he was now in charge of an

office in which a coworker had openly used vile epithets—conduct that any competent manager would not tolerate. Mr. Blank did not tell Mr. O'Dell to prohibit discussion of religion or the posting of church-related materials on the bulletin board. Indeed, in the conversation between Mr. Blank and Mr. O'Dell, religion was not mentioned at all. Mr. O'Dell has admitted this.

Mr. O'Dell misconstrued Mr. Blank's instruction. The reason was *not* lack of clarity on Mr. Blank's part but may have been Mr. O'Dell's misunderstanding of the reasons for Mr. Fiedor's demotion. Mr. Blank did not explain to Mr. O'Dell that management failures were the primary reason for Mr. Fiedor's demotion or even that there was a sustained finding that he had pressured subordinates to attend church events. Mr. O'Dell incorrectly believed Mr. Fiedor was demoted for merely posting information on the bulletin board about church events. And Mr. O'Dell incorrectly believed he was sent to diversity training not for being disrespectful to other employees but for discussing religion. Mr. O'Dell incorrectly concluded that when Mr. Blank said not to tolerate offensive remarks—Mr. Blank may even have said inappropriate remarks—he meant not just the vile epithets and disrespectful references to sexual orientation but also any discussion of religion.

Based on his incorrect interpretation of Mr. Blank's instruction, Mr. O'Dell told Mr. Fiedor and Mr. Grice they could not discuss religion in the office or post church-related materials on the bulletin board. Mr. O'Dell says some member of

management—he does not remember who—told Mr. O'Dell at some point—he does not remember when—that religious discussions or postings were prohibited. Mr. O'Dell now genuinely believes this occurred. But without more information, it is impossible to know whether this, too, was simply Mr. O'Dell's misinterpretation of someone's disapproval of disparaging remarks unrelated to religion—or even whether it was Mr. O'Dell who raised the subject and then misinterpreted the other person's response. I do not credit the assertion that anyone in the chain of command above Mr. O'Dell ever instructed Mr. O'Dell or anyone else that there could be no discussion of religion or posting of church-related materials.

Mr. O'Dell and Mr. Grice attended diversity training at the Department's office in Tallahassee. As part of the training, those seated at each table were asked to find something they had in common. When those at another table reported they had the same religion, Mr. O'Dell and Mr. Grice were surprised, believing that discussing this was somehow improper. The event and their reaction show two things: first, how thoroughly they misunderstood the reasons for Mr. Fiedor's demotion; and second, that even the Department's diversity trainers see nothing wrong with discussing religion when subordinates are not pressured.

As he left the diversity training, Mr. O'Dell saw a flyer for a church-related event on a bulletin board. Believing incorrectly that this violated Department policy, Mr. O'Dell reported this to his first-level supervisor in Tallahassee, Chris

Welch, who may have responded, "You're kidding." The record is unclear on whether the flyer was removed in response to the comment, if so who removed it, and, if it was removed, whether it was put back up. Nobody with personal knowledge testified on these matters, and I do not credit the limited testimony on this subject, including the testimony about statements by unidentified others. That the Department allowed the flyer to be posted in the first place is not surprising— the Department had no policy prohibiting church-related materials on community bulletin boards. I do *not* credit Mr. Fiedor's testimony that he was told the flyer went up only because a person responsible for monitoring the bulletin board was on vacation.

In September 2017, Mr. Fiedor filed a charge of discrimination with the Florida Commission on Human Relations challenging his demotion and the ban on religious discussions or postings. Mr. O'Dell submitted an affidavit on January 2, 2018 saying he had been "advised from management to monitor the bulletin board in the office to make sure that nothing religious or political was posted there." Pl.'s Ex. 7. This reflected Mr. O'Dell's misunderstanding of what he had been told. Mr. Blank probably read the affidavit at some point, but he did not believe Mr. O'Dell was actually prohibiting the posting of religious material. Mr. Blank took no action in response to the affidavit.

In April 2019, an employee of the northwest region—not Mr. Fiedor—posted on the bulletin board a flyer for an event at the same church Mr. Fiedor attended. Mr. O'Dell took it down. He reported this to Mr. Welch, who said he did not think this needed to be taken down. But the flyer was not put back up.

A summary-judgment motion in this lawsuit was heard on July 25, 2019. Mr. Blank learned as a result of that hearing that Mr. O'Dell had indeed taken down at least one church-related flyer; this was no longer just an allegation. Mr. Blank promptly issued a bulletin through an electronic system to all division employees—not just those in the northwest region—entitled "religious expression in the workplace." The bulletin said:

> This information bulletin is sent to emphasize that the Division of Investigative & Forensic Services has not had, and does not have, nor does the Department of Financial Services, any policy prohibiting or discouraging employees from engaging in religious expression in the workplace. This includes verbal and written expressions (including on Division bulletin boards).
>
> Notwithstanding the above, when engaging in religious expression you must be sensitive to the following:
>
> • Other employees have the right not to be coerced or pressured into sharing in or submitting to another's beliefs or invitations or being subjected to unwelcome religious harassment
> • Religious expression must not create the reasonable appearance that the Division or Department sponsors, endorses, or inhibits religion generally, or favors or disfavors a particular religion.
>
> It is not always clear when religious expression is appropriate or inappropriate. If you have any questions, please consult Employee Relations.

Defs.' Ex. 3.

Mr. O'Dell received the bulletin and changed course. He no longer prohibits religious discussion or the posting of church-related materials. I do *not* credit Mr. Fiedor's contrary testimony. The bulletin and the policy it confirms remain in effect.

## II. Proceedings

Mr. Fiedor filed this action against the Department of Financial Services, against Mr. Blank in his official and individual capacities, and against the Inspector General and two of her employees in their individual capacities. The amended complaint asserted claims for damages and injunctive relief under the First Amendment's Free Exercise Clause (count 1), Title VII of the Civil Rights Act of 1964 (count 2), and the Florida Civil Rights Act (count 3), and asserted a claim for injunctive relief under the Florida Religious Freedom Restoration Act (count 4). The amended complaint was later construed to include in count 1 a claim under the First Amendment's Freedom of Speech Clause. *See* ECF No. 103 at 3.

The amended complaint challenged both the demotion and the restrictions on religious discussion and postings. The defendants moved for summary judgment. The record established without genuine dispute that Mr. Blank demoted Mr. Fiedor primarily for management failings unrelated to religion. Mr. Blank also considered—and accepted—the Inspector General's reasonable finding that Mr.

Fiedor pressured employees to attend church events. Demoting Mr. Fiedor on these grounds was not improper, so summary judgment was granted for the defendants on the demotion claims. Summary judgment was not granted on the religious-restrictions claims, but the claims were narrowed.

A more complete matching of the claims to the counts in the amended complaint and the summary-judgment ruling is as follows.

Count 1 asserted a claim under 42 U.S.C. § 1983 based on both the demotion and the religious restrictions. The count sought an injunction against Mr. Blank in his official capacity and an award of damages against the individual defendants. Recognizing that the state is not a "person" within the meaning of § 1983, *see, e.g.*, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989), the count did not name the Department as a defendant. The count explicitly invoked the Free Exercise Clause and was deemed amended to also invoke the Freedom of Speech Clause. The count sought an award of damages caused by the demotion—not an award of damages caused by the religious restrictions. Summary judgment was granted on the damages claim because the record established the demotion was not unconstitutional. An alternative basis for the ruling was qualified immunity. Summary judgment was denied on the part of count 1 seeking an injunction against Mr. Blank that would end the religious restrictions.

Count 2 asserted a claim against the Department of Financial Services, not the other defendants, based on Title VII, which prohibits discrimination based on religion in the terms, conditions, or privileges of employment. 42 U.S.C. § 2000e-2(a)(1). The count sought an award of damages caused by the demotion—not an award of damages caused by the religious restrictions. Here, as on count 1, summary judgment was granted on the damages claim because the record established the demotion was not based on religion. The religious restrictions did not rise to the level of an adverse employment action, *see, e.g.*, *Davis v. Town of Lake Park*, 245 F.3d 1232, 1238-39 (11th Cir. 2001), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), nor were they "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (*quoting Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Summary judgment thus was granted for the Department not only on the Title VII damages claim but also on the Title VII religious-restrictions claim. And the ruling on the Title VII religious-restrictions claim made no difference anyway, because the claim for an injunction ending the religious restrictions went forward under count 1 against Mr. Blank in his official capacity.

Count 3 asserted a claim against the Department, not the other defendants, based on the Florida Civil Rights Act. The substantive principles that govern the

Act track those under Title VII. *See, e.g.*, *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998). Summary judgment was granted on this count for the same reasons as on count 2.

Count 4 asserted a claim against the Department, not the other defendants, under the Florida Religious Freedom Restoration Act, based on both the demotion and the religious restrictions. The count sought an injunction, not damages, apparently recognizing that the Act does not create an action for damages. *See, e.g.*, *Muhammad v. Cruz*, No. 4:14cv379-MW/GRJ, 2016 WL 3360501 (N.D. Fla. June 15, 2016); *Youngblood v. Florida*, No. 3:01cv1449-J-16MCR, 2005 WL 8159645 (M.D. Fla. Mar. 17, 2005). Summary judgment was granted for the Department on the demotion claim but not on the religious-restrictions claim.

These rulings left pending the claims for an injunction against the Department (in count 4) and against Mr. Blank in his official capacity (in count 1) that would end the religious restrictions. Because no damages claims remained in the case, the parties were not entitled to a jury trial. The case proceeded to a bench trial.

I make credibility determinations consistent with the statements of fact in this opinion. In addition, I credit Mr. Blank's testimony in its entirety. I do *not* credit Mr. Fiedor's testimony about what he was told by managers except to the extent corroborated by them and set out in this opinion. I credit Mr. Fiedor's

testimony about his religious beliefs and practices except as otherwise noted in this opinion. Mr. Fiedor is a devout Christian who genuinely believes he has a religious duty to share the gospel in appropriate circumstances—though not necessarily at work.

This opinion ultimately concludes that the only remaining claims—the claims for an injunction ending the religious restrictions—are moot. It is useful to begin the analysis, though, with an examination of the substantive principles applicable to the claims. To know whether a claim is moot, one must first understand the claim. Or at least it helps.

### III. The Freedom of Speech Clause and the Discussion of Religion

When the government acts as an employer, its interest in regulating the speech of its employees is significantly different from its interest in regulating the speech of citizens in general. *See Pickering v. Bd. of Educ. of Township High Sch. Dist. 205*, 391 U.S. 563, 568 (1968). "Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (citing *Connick v. Myers*, 461 U.S. 138, 143 (1983)).

Citizens do not surrender their First Amendment Freedom of Speech rights by accepting public employment. *See Lane v. Franks*, 573 U.S. 228, 231 (2014).

"Rather, the First Amendment protection of a public employee's speech depends on a careful balance 'between the interests of the employee, as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' " *Id.* (quoting in part *Pickering*, 392 U.S. at 568).

Mr. Fiedor asserts his First Amendment right to free speech was violated when he was prohibited from discussing his religious beliefs with coworkers. But the Freedom of Speech Clause protects a public employee only when speaking as a citizen on a matter of public concern. *See Alves v. Bd. of Regents of Univ. Sys. of Ga.*, 804 F.3d 1149, 1159-60 (11th Cir. 2015) (citing *Garcetti*, 547 U.S. at 418). "To fall within the realm of public concern an employee's speech must relate to any matter of political, social, or other concern to the community." *Id.* at 1162 (internal quotation marks and citations omitted). Speech is rarely entirely private or entirely public. *Id.* Instead, the court must consider the whole record and ask "whether the main thrust of the speech in question is essentially public in nature or private." *Id.* (quoting *Vila v. Padròn*, 484 F.3d 1334, 1340 (11th Cir. 2007)). Relevant considerations are the content, form, and context of a given statement. *Id.*

Mr. Fiedor's discussion of his religion with coworkers was not on a matter of public concern. He said he typically had religious conversations one-on-one with coworkers. He described it as counseling. He said he mainly offered

information about himself to help people. This was speech that, made on a street corner, plainly would have been protected by the Freedom of Speech Clause. But not when made privately to other employees in the workplace.

## IV. The Free Exercise Clause and the Discussion of Religion

The principles derived from *Pickering* for the Freedom of Speech Clause apply also to the Free Exercise Clause, but with a twist. *See Walden v. Ctrs. for Disease Control & Prevention*, 669 F.3d 1277 (11th Cir. 2012); *see also Shahar v. Bowers*, 114 F.3d 1097 (11th Cir. 1997) (en banc). To prevail on a Free Exercise claim, a public employee does not need to show that the speech or conduct at issue was on a matter of public concern; in most cases, as here, religious discussion among employees is *not* on a matter of public concern. It suffices instead to show that the government employer "substantially burdened" the employee's exercise of "sincerely held religious beliefs." *Walden v. Ctrs. for Disease Control & Prevention*, No. 1:08-cv-2278, 2010 WL 11493832 at *11 (N.D. Ga. Mar. 18, 2010) (J. Carnes, J.). The Eleventh Circuit adopted this reasoning on appeal. *See Walden*, 669 F.3d at 1286 ("There is no need to engage in the *Pickering* balancing test here, however, because [the plaintiff] cannot point to any evidence that [the defendants] burdened one of her sincerely held religious beliefs.").

"To substantially burden means to prevent an individual from engaging in religiously mandated activity, or to require participation in an activity prohibited

by religion." *Walden*, 2010 WL 11493832 at *6 (quoting *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1226 (11th Cir. 2004)).

Mr. Fiedor has a sincerely held religious belief that he must sometimes discuss his religion and invite people to church. But Mr. Fiedor testified that this obligation is not constant and that he is required to discuss religion only at "appropriate" times. Mr. Fiedor's testimony was not at all clear on when he must initiate conversations, invite coworkers to church, or discuss religion in general. Thus, for example, he first testified that he never initiated religious conversations at work and that, instead, at work he talked about work. He later modified this testimony, acknowledging that he did sometimes initiate conversations about religion, but he gave no clear statement that he was religiously obligated to discuss his religion with coworkers during the workday. And he said that when coworkers came to him, he offered them encouragement and advice, not an overt discussion of religion.

Mr. Fiedor's own testimony about his religious obligation to share his beliefs did not show an obligation to speak about religion in the workplace. And he has ready alternatives: he can speak to anyone, including coworkers, at other times and places. Curtailing Mr. Fiedor's discussion of religion at work for a limited period—that is, from the time of Mr. O'Dell's mistaken instruction until Mr. Blank set it straight—did not substantially burden Mr. Fiedor's free exercise of religion.

Moreover, Mr. Fiedor had a history of pressuring subordinates to attend church events, at least as shown by an Inspector General's sustained finding based on statements of multiple witnesses. No policymaker determined that this history called for a prohibition on all religious discussion by Mr. Fiedor in the workplace, but such a determination, had it been made, would have implicated not only the government's interest in maintaining an efficient workforce, but also its interest in protecting the First Amendment rights of other employees. Under *Pickering*, Mr. Fiedor's right to discuss religion would properly be balanced against the Department's interests. *See Pickering*, 391 U.S. at 568; *see also Walden*, 2010 WL 11493832 at *8. Had the Department elected, in response to Mr. Fiedor's history of pressuring subordinates, to prohibit him from discussing religion in the workplace, the *Pickering* balance might well tip in the Department's favor. *See Shahar*, 114 F.3d at 1107-08 (holding that to prevail under *Pickering*, a government employer need not "allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action" or make "a particularized showing of interference with the provision of public services") (quoting *Connick v. Myers*, 461 U.S. 138, 150-52 (1983)); *see also Walden*, 2010 WL 11493832 at *9.

Mr. Fiedor has not shown that his Free Exercise rights were violated by the temporary ban on discussing religion in the workplace.

## V. FRFRA and the Discussion of Religion

The Florida Religious Freedom Restoration Act ("FRFRA") provides additional protection for the exercise of religion. The Act provides that "[t]he government shall not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability," unless the government can demonstrate the burden furthers "a compelling government interest" and is "the least restrictive means of furthering that compelling governmental interest." Fla. Stat. § 761.03.

As the statutory text makes clear, FRFRA applies only to government action that imposes a substantial burden on a person's exercise of religion. *See Warner v. City of Boca Raton*, 887 So. 2d 1023, 1032 (Fla. 2004) (stating that to prevail on a FRFRA claim, a plaintiff must show "the government has placed a substantial burden on a practice motivated by a sincere religious belief"). Under Florida law, just as under the federal authorities cited above, "a substantial burden on the free exercise of religion is one that either compels the religious adherent to engage in conduct that his religion forbids or forbids him to engage in conduct that his religion requires." *Id.* at 1033; *see also Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 942 F.3d 1215, 1249-50 (11th Cir. 2019).

As set out above, prohibiting Mr. Fiedor from discussing religion at work did not substantially burden his exercise of religion. He is not entitled to prevail on this claim.

## VI. The Bulletin Board

When the government creates a limited public forum—including, for example, a community bulletin board in a government office—the government "may not exclude speech" if doing so "is not reasonable in light of the purpose served by the forum" or is based on "viewpoint." *See Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661, 685 (2010) (quoting *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S 819, 829 (1995)).

The northwest regional office had a bulletin board on which employees were free to post information on a broad array of subjects, including, for example, community events. Before Mr. O'Dell banned church-related postings, Mr. Fiedor had posted flyers about events at his church. After Mr. O'Dell's edict, Mr. Fiedor discontinued the practice. When another employee posted a flyer for an event at Mr. Fiedor's church, Mr. O'Dell removed it.

This violated the First Amendment's Free Speech Clause and perhaps also the Free Exercise Clause. The explanation is straightforward: had the same events been sponsored by a civic club or other nonreligious organization rather than a church, the flyers could have been posted. Banning use of a bulletin board or other

limited public forum for religious content, when the same content would be permitted if not religious, will not do. *See, e.g.*, *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 393 (1993) (holding unconstitutional a rule that "discriminate[d] on the basis of viewpoint" by permitting government property to be used for the presentation of all views about a subject except those dealing with the subject from a religious standpoint). And while, as set out above, the finding that Mr. Fiedor had pressured subordinates would have justified limitations on his discussion of religion with coworkers, he no longer held his management position, and a bulletin-board posting, without more, posed no risk of infringing the rights of others or interfering with the efficient provision of public services.

But for the issue of mootness, Mr. Fiedor would be entitled to an injunction protecting his right to place church-related material of this kind on the bulletin board.

## VII.  Mootness

The Department voluntarily abandoned the policies Mr. Fiedor seeks to enjoin. Mr. Fiedor is no longer prohibited from discussing religion with coworkers or from posting church-related materials on the bulletin board. Mr. Blank's information bulletin made this clear. And the bulletin has been followed without fail; there has been no return to Mr. O'Dell's abandoned policies. I credit Mr.

O'Dell's testimony that the bulletin completely changed the practice in the northwest regional office, and I do not credit Mr. Fiedor's contrary testimony.

To support federal jurisdiction, a claim must present a live case or controversy not only when filed but at every stage of the proceeding. A change of circumstances may render a case moot. *See Coral Springs St. Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1328-29 (11th Cir. 2004). But voluntary cessation of allegedly illegal conduct does not always—or even usually—render a case moot, because a defendant may return to its old ways. *Id.*; *see also Sec'y of Labor v. Burger King Corp.*, 955 F.2d 681, 684 (11th Cir. 1992).

In this circuit, government actors "have been given considerably more leeway than private parties in the presumption that they are unlikely to resume illegal activities." *Coral Springs*, 371 F.3d at 1328-29. "[W]hen the defendant is not a private citizen but a government actor, there is a rebuttable presumption that the objectionable behavior will *not* recur." *Troiano v. Supervisor of Elections in Palm Beach Cty.*, 382 F.3d 1276, 1283 (11th Cir. 2004) (emphasis in original). Thus, "a challenge to *governmental* action has been mooted when the alleged wrongdoers have ceased the allegedly illegal behavior and the court can discern no reasonable chance that they will resume it upon termination of the suit." *Id.* at 1284 (emphasis in original). "An assertion of mootness in such a case should be rejected only when there is a substantial likelihood that the offending policy will be

reinstated if the suit is terminated." *Atheists of Fla., Inc. v. City of Lakeland*, 713

F.3d 577, 594 (11th Cir. 2013) (internal quotation marks and citation omitted).

In determining whether a policy is likely to be reinstated, "the Court is more

likely to find that the challenged behavior is not reasonably likely to recur where it

constituted an isolated incident, was unintentional, or was at least engaged in

reluctantly." *Id.* (internal quotation omitted); *see Kennedy v. Omegagas & Oil,*

*LLC*, 748 F. App'x 886 (11th Cir. 2018) (holding moot a claim that the defendant's

convenience store did not comply with the ADA; the defendant mistakenly

believed, based on state inspections, that the store was ADA compliant and

promptly fixed the violations upon learning it was not). On the other hand, a court

is more likely to find a reasonable expectation of recurrence "when the challenged

behavior constituted a continuing practice or was otherwise deliberate." *Atheists of*

*Fla., Inc.*, 713 F.3d at 594 (internal quotation omitted); *see Sheely v. MRI*

*Radiology Network, P.A.*, 505 F.3d 1173 (11th Cir. 2007) (holding a claim not

moot when the challenged practice resulted from a years-long policy at the highest

levels of management and had been vehemently enforced on multiple occasions).

The Eleventh Circuit has noted several other factors that affect the mootness

analysis: whether the termination of the offending policy was unambiguous;

whether the termination was the result of substantial deliberation or simply an

attempt to manipulate jurisdiction; and whether the defendant consistently applied

the new policy. *Rich v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 525, 531-32 (11th Cir. 2013).

I find that the challenged instruction not to discuss religion or post church-related materials on the bulletin board has been completely and unequivocally abandoned and that there is no significant chance it will be reinstated. The instruction was a mistake at the outset; the division director Mr. Blank never adopted or approved it. Mr. O'Dell gave the challenged instruction only because he misunderstood Mr. Blank's directive to prevent offensive or disparaging remarks in the office. The instruction applied only to the northwest regional office managed by Mr. O'Dell, not to any other bureau or division of the Department of Financial Services. When Mr. Blank learned that the instruction had been given and acted on, Mr. Blank promptly issued the information bulletin making clear that the instruction was no longer in force.

To be sure, the information bulletin was a response to events that came to light in this lawsuit. The bulletin was an attempt not only to properly manage the division going forward but also to improve the defendants' position in the lawsuit. In most circumstances, a change in policy during and in response to a lawsuit, especially when announced only in a bulletin that could be countermanded at will, would not support a finding of mootness. The critical difference here is that Mr. O'Dell's instruction was a mistake from the outset. There is no chance that Mr.

O'Dell—whose personal views have never lined up with the instruction he mistakenly thought he was obligated to give—will repeat the mistake. The case is moot. *See Atheists of Fla., Inc.*, 713 F.3d at 577 (stating that a government actor's voluntary abandonment of a challenged policy renders the challenge moot unless there is "a substantial likelihood that the offending policy will be reinstated if the suit is terminated").

## VIII. Conclusion

The Inspector General concluded that Mr. Fiedor pressured subordinates to attend church events. Mr. Blank, the division director, demoted Mr. Fiedor primarily for unrelated mismanagement of his office. Among the mismanagement was failure to prevent the use of vile epithets for African Americans and gays and failure to deal appropriately with unrelated issues.

Mr. Blank told Mr. Fiedor's replacement, Mr. O'Dell, to prohibit offensive or disparaging remarks in the office. Mr. O'Dell misunderstood this as a directive to prohibit all discussion of religion and the posting of church-related materials on the office bulletin board. Mr. O'Dell instructed Mr. Fiedor not to engage in these activities.

When Mr. Blank learned of Mr. O'Dell's erroneous instruction, he issued an unequivocal information bulletin to the contrary. There is no chance that the

erroneous instruction will be reinstated. Mr. Fiedor's challenge to the instruction is moot.

A separate order will be entered directing the entry of judgment on all claims.

SO ORDERED on February 24, 2020.

<u>s/Robert L. Hinkle</u>
United States District Judge